Welcome. Welcome, Council. We're glad to see you. We wish we could see you in person, but at this moment, that's not really possible. But we're happy you're joining us today. We handle argument on Zoom much like we do in regular court, 15 minutes a side. We're going to obviously entertain a request by Appellants Council for some reply time. I'm going to keep time. I suggest you do so too, so you're not surprised when eventually the bell rings, as it were. So without further ado, Mr. Johnston, we'll hear from you first. Yes, Your Honor. Thomas Johnston for Hatikvah Intl Academy Charter School. And if I may, reserve three minutes for rebuttal. That will be granted. Thank you, Your Honor. This is an appeal of two decisions by an administrative law judge pursuant to the Individuals with Disabilities Education Act and by a district court judge. It's an appeal brought under both the charter school laws in New Jersey and the IDEA. And the core issue is the fiscal responsibilities for a private placement of a student who is enrolled in a charter school. We're aware of the facts, counsel. I think we can jump right in. Okay. The lower court, essentially what they did is they shifted the fiscal responsibility by their decisions onto a charter school. I'm sorry to interrupt, but we really do have pretty limited time and we do know the facts. So I'm just going to try to get right into the questions that at least I have, and I hope my colleagues don't mind. So first question I've got is, do we have to start by looking at this through the lens of traditional preliminary injunction four-factor test analysis? In other words, do we have to walk through those steps and ask the questions about likelihood of success, irreparable harm, et cetera, et cetera? There's an automaticness, so to speak, when in the first instance, you're talking about preserving a placement, but here we're not talking about preserving a place. We're talking about who's going to pay for preserving the place. So the question I have is, is it right to jump right to the merits or do we have to go through the traditional steps? No, the first issue is application of the automatic injunction, which does not require an analysis of the typical elements for an injunction. The fiscal responsibilities are intertwined with placement responsibilities for a local education agency. And when there is a placement, the way that a school satisfies its state put applications is through money. And so although right now the placement is not currently, the state put placement is not currently in dispute that it is at the Laurel School, the financial aspects of that obligation are very much in dispute. So the automatic injunction analysis still applies. Well, help me understand this for a second, because if that automatic injunction was meant to exist because they wanted just to make sure that the child stayed in place, and that's not an issue here, right? It's not a question of whether this young person is staying, that's done. All we're talking about is who bears the cost of it. Why is that so intertwined that we shouldn't be looking at this in the more traditional way? And just asking, have you satisfied the traditional steps? Because the way that a school system satisfies state put obligations is by funding the state placement. And so in this particular case, there's not a dispute about the state put placement, but we're here before the third circuit, which of course is going to provide guidance in a very narrow area of the law. And it's important that a message not be sent out that if the state put placement itself is not in dispute, then the resident district could just simply disregard its fiscal responsibility. Well, that wouldn't be the message, right? Why would it be the case that if we said, if the placement is not an issue, you have to meet the usual standards. Why would that send the message that the parent or the charter school or whatever the local educational association is, it's perhaps going to bear the risk or the cost. Why would that signal that they're going to lose necessarily? Then it shifts the burden on the respondents, in this case, the charter school to move on an emergent basis to satisfy the elements of an injunction, which is extraordinary relief under the law. And it does have the effect of essentially shifting the fiscal responsibility first to the charter school, which directly contradicts the school law. And so that's why we assert that the automatic injunction supports our argument. But of course, if you were to look at this through the prism of the traditional elements, then we are still entitled to relief. Okay, then go with that. Why are you still entitled to relief? Now, assume for the sake of discussion, we thought, you know what, there is a likelihood of success. Just assume that for the sake of discussion. Deal with the irreparable harm piece, because the kind of signal from the district court and certainly argument from your colleague on the other side is it's just money, right? You can deal with that at the end. Where's the irreparable harm? Well, first, the reimbursement mechanism that Judge Al-Jiyadi created and the district court approved doesn't have support in the IDEA. The language about granting equitable relief and just relief in the IDEA is for the benefit of the parents. So there is not a statutory path for HIPTCFA to receive reimbursement. That is a mechanism that doesn't have a legal basis. And so if there's no financial redress, then that is the presence of irreparable harm. Well, isn't the answer to that? It's not a statutory basis. It's a legal recognition of your right that you should have had it in the first place, and therefore you're getting damages. And that's not contrary to any statute. That's just plain old recognition of a wrong done and a remedy provided. Well, that sort of runs counter to IDEA's state put precedent that a district that has state put fiscal responsibilities, it has it and it's in place, irrespective of the ultimate outcome of the dispute down the road. What this adds is a new well, there's actually conditional state put responsibilities. It strikes me that that's an odd argument, Mr. Johnson, because what you're saying is you can't win if we look at this as a four factor test under traditional preliminary injunction analysis, because there's just no lawful way for you to win. That seems an odd position to take. Now, maybe I'm misunderstanding you, because it sounds like you're saying, even though they're completely wrong, and we can prove they're wrong, that there's not a remedy for us, unless you make them pay up front. Unless you make them pay in accordance to the statute, which is up front. Yes, Your Honor. And that would be true, even if you prevailed on the objection. If we prevailed on the challenge? Well, then, I mean, that remains to be seen. If we prevail at the administrative law judge level, we would assert that that becomes the new state put placement. But there's no precedent guiding us on what does that then mean if East Barnes was going to continue this challenge, that's continuing the pendency period. Does that mean that there's a there's not clarity on that? The shifting of the financial responsibility doesn't affect the placement of the child a bit, does it? I mean, the fact that Mr. Inzelbrook is here, and content to remain silent, sort of indicates the parents and the child are happy. You know, they might have a preference for one side or the other having to pay, but it doesn't affect them. They don't care. In the end, the child is where the child ought to be. That's in place done. All we're arguing about now is the cash, and who's going to front that cash. And that's, that's why I'm pressing on this point, because I'm not sure I'm not sure logically, how we get back to your assertion that this would be a new placement, or this is all bound up in the law. And there's no to remedy a wrong about who should have paid. Yeah, I can't explain why Mr. Inzelbrook's not participating. But we have a charter school, which by its nature, lives as long as its charter lives, and charter schools in New Jersey are shut down on a regular basis. We also have a student who will mature out of the grade range that Hedekova serves. So this student will at some point be a position. Then if you take that to the extreme that they don't have stateful rights to continue, you know, because he sponsored will have been denied a chance to, to challenge the placement if you take their rationale. And so, you know, there, there is jeopardy that the parents are confronted, why he's not participating is inexplicable to me. Well, leaving that to the minute, we've got irreparable harm, because we face rechartering every couple of years, or whatever the timeframe is. And we've got implicit in that might be we have budgetary issues, we have teaching qualifications, we had a bunch of issues that the school district doesn't have. And a failure for requiring us to pay this money up front is not just a monetary pecuniary thing, it has qualitative impacts on the school on the charter school. Now, I don't mean to put words in your mouth. But was that what you were saying or not? In essence, Your Honor, its budget is 115th the size of East Brunswick's. And the funding formula for charters were carefully devised. And that explains why there's no reference to charter schools taking on fiscal responsibility for private placements. And there's a half a million dollars a year that East Brunswick is paid attributable to HATICFA students, and the record reflects that. And so requiring that HATICFA which is subject to heightened performance standards, there will always be an East Brunswick school district, there will not always be a HATICFA charter school. And they have a very program that putting this kind of obligation is a strain that the legislature never intended, and it is irreparably harming HATICFA. Now, can I can I just probe on that a little bit? The irreparable harm requirement is fairly rigorous. It's not it's going to cause us some trouble. This is a monetary thing. And I think we've we our case law has recognized an exception when money is involved, if the very existence of an entity is hanging in the balance is in jeopardy, basically. Is there anything that says that I mean, it may be it may be that your client would suffer some hardship if they had to pay, but there's nothing that says that you're going to go out of business. I mean, the students not even going to be around all that long in the school system. This isn't what would put your your your client under what it No, we're not asserting that, but it will have a meaningful impact in the classroom. It has a relatively high staffing model. And the annual cost for this program is is roughly a teacher salary. And so it can have a real impact, maybe not quantitative, but that's essentially the type of reputable harm. And so the impact is, is, is meaningful. And of course, is reputable harm threatened to HK that, you know, there is a, a lack of assurance of any state put rights whatsoever. Should it take for no longer be the LEA, whether by closure or because of grading out a tick file. Anything more counsel? Yes, your honor. I mean, one one thing area and as to the elements in your the your honors have rightly focused on reputable harm, of course, it's important aspect of injunctive relief. But the elements of injunctive relief is a way of So right now we have a statute that clearly places fiscal responsibility for private placement on charters. We have this particular case, which now says that in fact, charter schools don't have that, that resident districts don't have that fiscal responsibility, that it's conditional. And in fact, charters have that fiscal responsibility, unless a dispute, unless the dispute arises after expiration of a period to challenge it. And so what we have here is conditions to incentivize charter schools not implement programs right away. By your argument, aren't there problems with the incentives to I mean, what your assertion is, you might be right about this, right? That's why we're arguing this case, here on both sides. But your assertion is, the charter school, with no skin in the game, no, no financial stake, can negotiate and bind the school district to a very expensive private placement. And the school district's got nothing to say about. And that's just the way it is. That's the way the law works. You're entitled to do that you can negotiate with the parents, you can reach a settlement that can be blessed. East Brunswick isn't at the table, they show up later and you hand them the bill. Now, how is that a fair system? How does that work? You know, the record may not have drawn this out as clearly as it could have, but they do have some skin in the game. They don't receive payments for this student, but they have to encumber the seat. So they do have a cash flow loss equivalent to the student funding. Which is how much? I think, well, the last year that we have in the record is approximately $13,000. Okay, so they maybe are at risk $13,000, but they're definitely negotiating with East Brunswick's money, right? Well, you know, the legislature here is the one that decided how to set this system up. They could have created hybrid LEAs, but they set up this system in a way to balance obligations of a charter school to serve a cross-section of the community and to give the resident district some modicum of due process if there's a private placement. For 10 years, the charter school law was in effect where this right did not exist. It only was enacted in 2008. And so, and as our papers indicate, these disputes have multi-school stakes that run into hundreds of thousands of dollars. The suggestion that it's inequitable for the charter school to do this, well, then the question is, well, how come the regulations don't require the charter school to do anything it didn't do here? You know, the regulations don't reference the charter school even inviting the resident district to an IEP meeting. And that occurred here. It doesn't even reference the resident district having a role in the IEP decision-making. And so, you know, the charter schools have to deal with the laws as they're and that's exactly what they did here. And he's probably was not even alleging otherwise. Absolutely. You've we're, we're over time, but I did have a question for you. It was mentioned in the briefing that March 17th and March 24th were days for the, the hearing for the due process petition. Did that occur? It occurred and it's still ongoing. There's a hearing date on Thursday and more in June. Well, let me ask you then is there, you know, we're hearing this case today. It'll take us some time to process an opinion one way or the other. Does it make sense for us to wait till after we hear about the result of the due process hearing? Well, your honor, this statutory timeframe has 45 days to resolve this due process hearing for reasons that New Jersey rightly deserves blame. We're now in day 400 in who knows. We don't have assurance of when this hearing is going to be concluded. We have a charter client who's paying costs that the statute does not provide to the charter school. And in fact, I think this court's decision very well could very assist in a very, you know, beneficial development in the case. But the due process hearing could what we're dealing with here. Is that not true? Maybe or maybe not. Even if it prevails at the hearing level, you know, there's never been a case like this. And so does that East Brunswick say, well, our state put rights tell us that we don't even have to pay because we're going to file an appeal in district court, essentially similar to what they did here. Only here, of course, they didn't even have a program for HK when they filed an appeal. But do they perpetuate dependency just to keep the fiscal costs on the charter school? All right. Well, so you say you say you've got another hearing Thursday. I mean, can you give us some indication? Is it almost wrapped up or there? Are you talking about any more? I could represent that the respondents haven't even put on witnesses yet. And we've had we've had, I think, two or three days of hearing, maybe two. I want to be conservative. I don't want to overstate it, but we had two or three days already. They're not consecutive. And the next one is Thursday. And then after that, we have dates in June. But and we have a status conference with the administrative judge tomorrow afternoon. All right. Well, I know something happens that might bear on our case. I hope the parties will advise us. So, of course, Jordan, do you have any other questions? No, Judge Serica. OK, thank you. We'll get you on rebuttal and we'll hear from your adversary. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is Jody Hallett and I represent Apelli East Brunswick Township Board of Education for the same reasons that are set forth in our papers. HATICFA hasn't met the standard for injunctive relief in this case. Well, let's start with the stay put injunction. Does what's your position on that? The automatic preliminary injunction? Yes. Yes. Well, the intent, as the court's aware, the intent of the automatic stay regarding us in the state put provision in the idea is to ensure that a disabled student's placement is not unilaterally changed by a school district pending an underlying due process. So it just ensures that the status quo is maintained. We don't have that issue here. As Judge Jordan pointed out in counsel's argument just a moment ago, this student, all parties agree that the pendant placement here is the Laurel School. The only issue remaining is who is to pay for the placement during the pendency of the due process proceeding. Well, Ms. Hallett, I'm not trying to take positions. I'm just trying to ask questions. So I want to put to you, Mr. Johnston's answer and have you answer his answer. He says these things are all tied together. You can't really unwrap the money from the placement. That's the way the system works. And therefore, the automatic nature of the state put relief in the statute should apply in this instance. And you should not you should go straight to the merits. What's wrong with that argument? Understood, Your Honor. And respectfully, HATICFA is the is the educational agency that placed this student at the Laurel School. So the financial responsibility under the automatic state put provision would apply to the party that has educational responsibility for this student. That does go straight to the merits, right? Now you're now you're past irreparable harm or anything like that. And you're just saying they should lose on the merits because their assertion is under the law. The the school district clearly is on the hook. The ALJ was off the reservation here. And so was the district court, because there's nothing in the law that indicates that a charter school should be paying. It's always and always and always about the school district bearing the cost. So, I mean, if you want to go to to the merits, OK, but how is that an argument about whether automatic stay or traditional four factor analysis is in play? Well, going into the automatic preliminary injunction that only applies is clearly under the idea applies where a parent is challenging the placement, the IEP that's been proposed by the district. That set of facts is in present here. So it doesn't invoke the automatic preliminary injunction in 1415 J. It's just it's just not applicable here. This is a unique situation where you have a resident district who's challenging whether or not they can provide the same placement or program in a lesser restrictive environment. So would we be would we be doing violence to the statutory scheme and creating perverse incentives the way Mr. Johnston asserts we would if we were to look at this using the four factor analysis? The traditional P.I. analysis? No, your honor, I think the four factor analysis is more appropriate here than the automatic preliminary injunction in the state provision because before we get there, I mean, I in our case, we pointed out that I think there's not really any doubt about this, but financing goes hand in hand with pendant private school placement. So it may be a little awkward, but isn't that still I mean, financing is financing really foreign to the automatic state put injunction? No, your honor, I mean, to a certain degree, financing does go hand in hand with the placement. But again, that traditional state put analysis is where is where there's a threat to the child being removed from their placement. So it's through the lens of the child being removed from the placement. The last thing we want to do is shift the burden, the financial burden to the parent. So here we have two educational entities that are that are fighting essentially over financial responsibility, whereas that automatic preliminary injunction provision is is to protect a parent from having to bear that fiscal responsibility. Well, that's certainly one way to look at it. But perhaps one way to look at it is also to say that the that the automatic nature of the injunction is to make sure that nothing at all, nothing puts at risk the placement. And if there's arguments about who pays, even if it doesn't involve the parents, that that potentially puts at risk the placement. And therefore, you don't talk about traditional factors, you just go to the merits. I kind of, you know, I, I take it that's kind of the pitch that Mr. Johnson's making that seems to be what MR might be saying. Why, why if why would we be off base if we thought of it that way? I'm sorry, I just want to understand your question. It thought of it that way in which the thought of it as as being just what Judge Shigeru's quoted to you from MR that these these two things, placement and money are inextricably linked. And therefore, we're not going to handle this like an ordinary PI, we're going straight to the merits, because as soon as you start arguing about even the money, you're arguing about the placement. I think an argument can be made that to go straight to the merits, I think MR is distinguishable, obviously, from the situation that we have here, whereas the student in MR became the financial responsibility of the high school district at the time he aged out of the elementary school in that case. And the relationship between ascend receive districts, ascending and receiving district is quite different than the relationship that we have here between the educational institutions. So this was initially filed as an MR. The reason that we're in the preliminary injunction world to begin with is because this was initially filed as an emergent by the parents to ensure that one of these two parties was going to pay for this placement at Laurel school. So that's how we kind of arrived here. And now that was the jury. There's another thing. I mean, I, the statute talks in terms of it, I'm referring now to NJSA 18 a 36 a 11 b, it's a fiscal responsibility for any student currently enrolled in or determined to require private day residential school staff shall remain with the district of residence. Doesn't that erase all doubt as to who ought to be paying? Then that would be the district. It is. And if you read further, your honor, the statute also allows the resident district, as you're aware, to challenge that placement and, and demonstrate that it has a lesser restrictive environment, it would be essentially totally illusory for the district to have to pay for the placement during the pendency of the due process, then be successful on the merits of the due process, and have a court determine that it does, in fact, have a lesser restrictive environment available, but, but have no legal remedy to recoup all the funds that it had put forth to pay for that private school placement during the pendency of that challenge. So it's the position of the district that that provision in 11 be that allows the challenge obviates the district's responsibility to pay at that point, while the challenge is ongoing. And, and as, as it's been pointed out, obviously, in the papers, and the reason that we're here today is that there really is no precedent for this matter. Well, is there any? Go ahead. I'm sorry. Is there any significance to the situation or the fact that the school district was present when the settlement was entered into, and certainly filed a challenge within the appropriate time, but no objection was made earlier? That's the thing that is significant here? Or is that beside the point? Your Honor, I think that that is of no moment. The negotiations between the parties between the parent and the charter school with respect to the Laurel school placement were exclusive of the school district in this matter. And the results of that agreement was the IEP in which was the subject of the challenge, which was timely filed, as Your Honor noted. And I ask you to respond to this language from our drinker by drinker case, we were quoting the Second Circuit, but we adopted it basically implicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing. So, it looks like all three of the players were mentioned there, right? An agency, a parent, the school district, and the statement is made that implicit in maintaining the status quo is the school district pay. Why should we, particularly in light of the statutory language quoted to you by Judge Garris, why shouldn't that just, if we're going to the merits, why isn't that game over for you guys in the school district? Thank you, Your Honor. In drinker, again, that's the traditional analysis of the state court provision. And when the court in drinker refers to the school district, they're referring to the local education agency, which in this case is the charter school. So, the maintenance of the status quo under the state court provision rests solely with the quote school district, which is the local education agency, which is Hatikva in this case. So, we actually think that that provision supports the district's argument that the fiscal responsibility, that nexus between the state placement and the financial responsibility that was mentioned earlier with respect to MR, and now with drinker, that that rests solely with the charter school. You think that the statutes would talk about the school district and the cases which talk about the school district can be read to say, it falls on the charter school to pay. Do you have any authority for that at all? Yes, to your first question, that school district refers to charter school. The charter school act does say that charter schools are considered the school district for purposes of proposing and providing a free and appropriate public education for a disabled child. So, by extension, they are the school district when we're looking at those other cases. When we're looking at the use of the term school district in a case like drinker, that never contemplated what we have here. It doesn't refer to the resident district as being a separate entity from the charter school. Those are cases in which the school district, which is the LEA, and the parent are in a dispute over the placement. So, the school district, as referenced in any of that progeny, should be extended to the charter school. Won't this put charter schools at risk all over New Jersey? If we thought that the law provided what you're suggesting, then doesn't that lay the burden of potentially high costs of private school placements on the entities that are least well-positioned to bear it? While the school district, which has vastly more money than any individual charter school, can just, as Mr. Johnson indicates, play the clock out. Just keep filing, appealing, letting it go. Doesn't that seem like as a policy matter, it would be an odd thing for the legislature to be wanting to have happen? Not at all, Your Honor, because it's unequivocal that the IDEA requires and obligates an LEA to look at the full spectrum of programming before determining what's appropriate for a student. So, charter schools, as the LEA for these disabled students, are required to consider all lesser restrictive environments before they get up to the most restrictive and arguably most expensive placements in a private day school. So, the application of the district's interpretation and Judge Thompson's interpretation and Judge Olgiati's interpretation is that what it really does is reinforces a charter school's obligation to consider all program options before getting to that expense. Right. Well, assume that happened here. Your position wouldn't be any different, would it? I mean, Patikfa says, yeah, we thought about this real hard. We thought through all things, and this is the right thing for HK. And your assertion is, well, no, it's not. We could do it. And then when I think the record shows, when specifically asked about that, the comment back was, well, we're not ready to talk. It's true, we think we can do this, but we're not ready to say specifics. We can't speak to that now. Now, maybe I read that wrong, Ms. Howlett, but I think it might have been you who said it. But somebody on your team said, yeah, we could handle this without a private placement, but we can't really talk about that now. I mean, if you couldn't talk about it then, doesn't that indicate that you really didn't have something ready and that the charter school was doing what it needed to do, whether you were happy with the bill at the end or not? Well, Your Honor, I mean, and going to the merits, which we've been kind of staying away from a little bit, is that, I mean, it's the district's position that the charter school did consider lesser restrictive placements before determining that the Laurel School was the appropriate placement. And with respect to the commentary that Your Honor just quoted that was in counsel's pleading, I respectfully taken out of context by counsel in their papers. But the, again, going to the narrower interpretation of what we're permitted to do under the challenge, under 14-2.7, which says that we're narrowly limited just to the question of whether we can provide the program in a lesser restrictive environment. Whether counsel wants us to provide some other program is of no moment, because we're only charged with implementing their IEP in a lesser restrictive environment. So I challenge that statement as being not only- Wouldn't it be better for the system if the charter school could do exactly what it did here, and then the school district is incentivized to be involved in the process, not to stand by and say, well, we weren't there, we didn't know, but to be involved in the process, instead of after the fact saying, we weren't there, so we've got no responsibility. I'm trying to think through the knock-on effects of this. If we rule the way you want us to rule, the school district's always free to say, we weren't there. And besides, we think we could do it better. Now make them pay. Whereas if we rule in favor of HTIHCFA here, going forward, the school district can't stand back and let things happen. It's got to be involved. Well, your honor, there's a mechanism in statutes that exists right now, and the legislature hasn't carved out a mechanism whereby the resident district has a quote, say, or right to, or an obligation to participate in that lower decision than the charter school's decision. It's strictly the charter school's child study team that makes the decision with the parents, that makes the decision with respect to placement. So in theory, it might be nice if we could reshape the entire system, whereas the resident district who has You'd have influence, right? Right. But the only mechanism that we have as it exists now is the right to challenge once that under 36A, 11B, is to challenge that placement once it's already been proposed. You know, if I could follow up on something I believe Judge Jordan said, maybe I said it, I don't know, but thinking about this in a big picture kind of way, in the next case, if we adopt your argument that it should be the charter school that pays, it doesn't in the next case, let's say it's not a charter school as well off, and actually could bankrupt it. Does that make any sense if we adopt your rule? I Your Honor, I can't speak to that hypothetical in that a charter school might go bankrupt. I mean, the the fact of the matter is that the charter school is the institution that is responsible for determining what an appropriate placement is for a student. And it's just like any other educational institution that has to make that determination of what is, you know, what is appropriate under the circumstances. But again, I'm talking about who's paying the bill. I get their responsibility. And that's not really in question. It's who's paying for it. And I could see where that would be create a real problem based on the sort of regime as you see it. I it may Your Honor, and certainly that is a consideration that a charter school might have to consider when determining an appropriate placement for for one of its disabled students. To the inverse, I mean, you have a school district, I know, should it be? Should that be their consideration? Or should the consideration be what's the right placement for the child? In other words, wasn't the IDA specifically set up with the idea that what's going to be best for the child is what's going to happen, and the state is going to pay for it. And we don't care whether the state is a charter school, or the state is a school district, we're not going to play slice and dice here, we're just going to say the state's going to pay for it. And the child is going to be taken care of. Isn't that the overarching message of the IDA? And by following your logic, don't we get removed severely away from that? Because now we place financial burden of an extraordinary nature on that funny on the entity least able to handle it. And by your own question or statement a minute ago, they'd have to think about their budget, instead of thinking about what's best for the kids. Well, I want to I want to clarify, Your Honor, as as my statement, because the IDA does does not allow an educational agency to consider budgetary restrictions when considering whether to provide a fee to a student. So I just want to clarify that. So I agree with the court as to that, as to that. I will challenge though, that as is the case with a school district, as well, whether it's a big district like East Brunswick or, or a smaller school district, making an edge decision as to how to provide a free appropriate public education to a disabled student is cost intensive. And it could bankrupt a local education, a local resident district in the same manner in which it could bankrupt a charter school. So I think that that consideration can't be of, you know, a monumental influence to the court in this consideration that, you know, had Tickfaw is claiming that they have financial hardship and that this placement would, you know, would would cause them undue burden, undue burden. Again, had Tickfaw made this agreement with the parents is knowing how much this placement cost. And, and your, and your assertion seems to be, they made the decision, they should have to live with the consequences. And our, our responsibility is to look at the statute and the New Jersey regs and our own decisions and try to figure out whether that line of reasoning's got any pull at all, when a lot of what we've written and what we've understood from the law is, this falls on the school district, it falls on the school district. And you can say, well, that's because the school districts were the ones making the decision in those contexts. But that seems to be the way the law is written. And you're asking us to say, well, read school district to mean local educational authority, ergo charter school, because it was the decision Well, with respect to the court's questions regarding Drinker, that would, that would be my response. With respect to 36A11B, I, it's the district's, it's the East Brunswick's argument that by way of the challenge, that's, that's written into 11B, the legislature couldn't possibly have created a mechanism to challenge the placement, but offer that district no relief. So what would happen, for example, in this case, the due process was filed by East Brunswick in November of 2019. So the student has been in this placement since September of 2019, prior to, prior to filing for due process. So from the time that the petition was filed through the present, we're talking about, you know, a year and six months, a year and a half's worth of time. So even if we had a decision by Judge Olgiati tomorrow, East Brunswick would have paid for this Laurel School placement for a year and a half. And then under Hatikva's line of, what the Hatikva's asking the court to do is to find that Judge Olgiati could find East Brunswick has an appropriate program in a lesser restrictive environment. Oops, Hatikva had, had created a program that was too restrictive and East Brunswick is successful, but yet East Brunswick is still on the hook and had already paid for. How is that different? How's that different from any other due process case where, where you, you have a fight that doesn't involve the charter school. It's just the school district and the parents and the state put orders in place and it takes a year and a half and the bills are mounting up. And ultimately there's a decision that says, well, that was wrong. Take the child back out in those circumstances. There's, there's still some well, you tell me how, how's it different? I'm sorry. There's two major differences. One is in that, again, in that traditional state put analysis, we're talking about the burden, the fiscal burden being between a school district or a parent, which is a lot different than a school district or a charter school. Okay. Let's just move past that, move past that and tell me in the end, in a case like that, does the school district get to say, look, this was a mistake in the end that it was decided this was a mistake. Now you pay us $300,000 for the placement parents. No, your honor. And no, it's not fair, but you're stuck with it. Yes. Your honor. Okay. Then how is this different than that? I think the second distinction is more notable in that. Unlike a case where there's a dispute between a parent and a district, this is a case where the charter school chose this placement. So when we're talking about like an unfair financial burden and what your honor's asking about is that Hatikva chose this placement. So imposing it upon East Brunswick in a traditional state put analysis, the reason that a district has to eat those costs in a traditional state put analysis is because we can't make a parent pay for it. And the district is providing the status quo that the parent and that the student is entitled to here. The status quo was determined by Hatikva, but yet they have no financial responsibility. Right. And what we're, I guess I'm going back to the question I asked earlier, so I don't want to be repetitive and burn everybody's time. But from the perspective of the law, does the law care one whit whether one arm of the state is paying for it or another? This is public monies. These are public schools, even if it's a charter school, it's a public school. And the law doesn't care whether it's Hatikva or whether it's the school district from the sense of what's fair to the state. It's the state's money and the state's going to pay for it. So it's really not a question of the school districts being treated unfairly or Hatikva is being treated unfairly from the law's perspective. All that matters is the state bears the cost. And if the state bears the cost through the school district or through Hatikva, the ultimate purposes of the IBA have been served if the child's placement is not disturbed during the litigation on the due process hearing. I mean, that's sort of an inelegant summary, but is that an unfair or an inaccurate way for us to view the IBEA? No, your honor, I think that's accurate. I just posit that we want to incentivize both charter schools and more traditional school districts to seek less restrictive, to abide by the obligation under the IDEA to look at the spectrum of placements and place a student in the least restrictive environment. And I think that by allowing charter schools to obligate school districts to expensive private day school placements without any financial responsibility, without any burden whatsoever, I'm not sure that that complies. Well, they say they've got a burden. They say they're losing $13,000 to $14,000 a year because they've got a seat that they're obligated not to fill, which they could fill. So we do have skin in the game and according to our budget, that's real money. So we're not just messing around here. We have an incentive to do this right. We try to do it right. That's what I said. Is he wrong? He's not wrong, your honor, but it pales in comparison to the cost of what a private day school is. And a charter school, knowing that they have no financial responsibility whatsoever is, I mean, we don't want to incentivize or we want to incentivize charter schools to look at lesser restrictive placements and all school districts look at lesser restrictive placements. It's in the interest of the state. It complies with the IDEA obligations to look at the spectrum of options. And we don't want charter schools to make private school placements because it's the, you know, something that just parents want, or, you know, we want to really incentivize that lesser restrictive environment to cut down on the costs. Like you said, your honor, that the state doesn't care, but that's taxpayer money at the end of the day. Can I ask you a question, assuming we disagree with you? Has there been any thought been given to exactly how East Brunswick or other municipalities, school districts would handle this? Would you become directly involved then? Would you be at the table in every instance? Your honor, the law does not, it doesn't permit us to be involved or at the table. And even assuming that we had a seat at the table for some of these decision-making processes, we don't have any authority to make those decisions regardless of our participation level. Okay. Okay. Judge Jordan, do you have any other questions? Well, just one sort of as a practical matter, when you say the law doesn't give you any right to be at the table, assume just for the sake of discussion for a moment, that were true. I don't know whether that's true or not, but assume it's true. You didn't have a right to be at the table, but you were in the room when this first thing happened. You could have chosen to speak. I assume you were at least recognized. Are you saying that you wouldn't have some influence? Who grants the chartering to the charter schools? The state of New Jersey, the Department of Education. Okay. Does the school district have any influence on whether charter schools are granted within their district? I'm not aware, Your Honor. I would assume that they have some, but I'm not familiar with the entire process for that. I'm sorry. Just sort of seems to me stands to reason when you say the law doesn't give us any right, we wouldn't have any say at all, that if there were a financial incentive, the school district would know how to make its interests known and it would get involved in some way because it would be their interest to do it and that the charter schools would have an interest in knowing and wanting to know what the school district's positions were because that might have an influence on their continued existence, but maybe I'm just extrapolating too much. No? I don't disagree. I mean, as a practical matter, that might be, like I said, the process for granting a charter by the state I'm not familiar with, but with respect to the IDA and the code here in New Jersey, there's no statutory or regulatory obligation for a charter school IEP team to invite the resident district to be a part of the IEP decision-making process. Okay. Thanks. Judge Sirica, do you have anything? Nope. Okay. Just one other thing. At the end of your adversary's presentation, I asked about the due process hearing and what's going on. I just thought if there's something you wanted to comment about that, it's something you disagreed with, give you a chance. No, your honor. Thank you. I appreciate that. Council's recollection is accurate as far as I'm concerned. I think that both this court's decision and the underlying due process with ALJ should just continue as I don't think one would affect the other in this instance because we're talking about retroactive payment. I agree with council. Okay. Thank you. Thank you, council. All right. We'll hear your reply, sir. Yes, your honor. Very briefly, the implementing regulation designates East Brunswick as the district of residence. That's 6A23A-15.4B2 for purposes of the challenge. What that means is that in the due process proceedings, which are governed by the administrative code at 6A14A in New Jersey, that East Brunswick takes on the responsibilities, including state put responsibilities, which are in that section. In terms of school district fiscal responsibility, not only does the charter school law squarely put it on East Brunswick, but the regulations do as well. In terms of influence in the decision to place HK at the Laurel School, East Brunswick officials attended an IEP meeting a year prior, September of 2018. They were at the meeting. Although the cost for the program recommended then, which was also a private school, was comparable to the cost now, they did not file a challenge to that IEP that was written in September of 2018. That relates to the limitations argument we have in our papers. And then they did not appear at the hearing, even though they were a party in the case with all the prerogatives. They could have been heard. They could have also objected to the settlement. How would they object to the settlement? Because they were a party in the case. They just inexplicably didn't appear for the first hearing day. So they had standing to be heard in terms of the contents of the settlement. And if they wanted more time to consider it, they could have asked for more time. They could have done any number of things. Okay. Hold on for just a second. Judge Sirica, I think you're on mute. So do you want us to decide on the case on this basis or in the more general basis? I think the more general basis is what seems so pronounced because it's a simple application of the plain meaning of the law. But I just want to rebut assertions that they didn't have an influence in the process. And then lastly- Hold on a second. Would they have it going forward into other kinds of cases? Ms. Howlett has said they just don't have a seat at the table. Law doesn't provide for them to be involved. How would, under your view of how the law works, East Brunswick or any other school district have an opportunity to protect their interests by saying, wait a second, you charter school might want to see this person go to the most expensive day school in the state. And the parents might want to have their child go to the most expensive day school in the state. And you're both happy to see East Brunswick pay for that. But that's not the right placement here because we can handle this child's needs. But we don't have any way to get that view taken account of. I mean, I'm not doing justice. She did a lot more elegantly than I just did, but that's sort of the, I understand that's the argument. What's wrong with that argument? Well, several problems with that argument. Number one is they could prevail in a challenge, which unlike the illusory fallacy that's been argued, brings real meaningful financial value to the school district and also has a chilling effect with the charter school. So how's, explain that chilling effect, because that's what I was trying to ask about earlier. What's the disincentive for the charter school just to say, yeah, it's not my money, go ahead, you know, go to Richie Rich School. Well, you know, I think any school client embarked on a due process hearing would think of it as extraordinarily stressful, resource taxing, not to mention direct outlay of legal fees. And a resident district does not want to lose this kind of contest. I'm sorry, a charter school does not want to lose this kind of contest with a resident district. It's one community that both school systems operate in. Also, under the IDA, there are complaint investigation procedures. So if a resident district finds that a charter school has a pattern of disregarding the least restrictive environment, they are under state code to request an investigation by the Department of Education or the U.S. Department of Education that they're not satisfying the least restrictive environment. And then more broadly, East Brunswick can and has advocated for itself and took positions against the TICFA's access and equity practices about serving all students. There's decisions that are published, at least on Lexis, of East Brunswick appealing decisions to allow TICFA to operate. The very first charter is a subject matter of a certification denial by the state Supreme Court. So East Brunswick is definitely capable of advocating its view as to TICFA's practices. And that's real meaningful value. The last thing I just wanted to note is they waited until August of 2020 to recommend a program. And my adversaries suggest, well, that's because we're just going to replicate what's in the IEP. But if you look in the record, what they offered entailed a one-to-one aid, and it entailed a behaviorist. They entailed meaningful aspects of a program that were different. And they only did that when the ALJ compelled them to do so. And so the real risk here is that a resident district is going to just simply drop a challenge or, I'm sorry, to file a challenge to these placements and just sit back, irrespective of the merits. And that's the inverse of her hypothetical that she took exception to. Well, what if we have to pay for this, even if we prevail? But imagine a scenario where the charter school pays for it, when the resident district literally doesn't have a meritorious program to suggest until compelled eight months later after the fact. That's all I have, Your Honors. All right. Judge Jordan, do you have anything more? No, thank you. Okay. And Judge Sirica? No. Okay. Thank you. Well, we thank both counsel. We'll take the case under advisement. Thank both counsel for their excellent arguments today, their excellent briefing, and it's great to see you. And we thank you for joining us this morning. Actually, all counsel, I shouldn't just say both. But we wish you well, and I'll have the clerk adjourn court for the day.